trial court ruling that allows for a Fourth Amendment exception based on a First Amendment premise. What I mean by that is the trial court allowed the police officer to take into consideration in weighing his balancing test the fact that my client was a member of the  Los Angeles when he balanced whether or not he could use a threat of deadly force in effecting a traffic violation. Well, in light of all of the circumstances that were apparent to the officer, including the fact that Cox was speeding, sped away from him, ignored him, was obviously trying to evade him, turned around and was obviously coming right at him, and that he was a hell's angel, into account. Well, I would certainly concede to the Court that this wasn't a matter of a person pulling over immediately and the officer took off after him. But the Court will remember from the record, this entire incident, driving past the officer, turning right, then turning left into the cul-de-sac, was, in the officer's estimation, only 30 seconds to a minute long. So if we remove how long it took to wipe out Hiroshima, I would concede that certainly pointing a gun at someone doesn't take very long to pull the trigger. But my point is that when all of this happened, the officer was following Mr. Cox, and if you remove the hell's angels aspect from the equation, then were those circumstances, driving past, looking at the officer, turning right, and then turning left into the cul-de-sac, are those enough to ---- And turning back around and heading full steam ahead at him. Well, I don't think he said full steam ahead. Okay. I'm exaggerating a bit. But heading right toward him, still speeding, and he turned right and headed full steam ahead.  Okay. So you're arguing that at no time can a police officer ever take into consideration an association of somebody with a group? Is that pretty much what you're arguing? Certainly not. But I would say that there must be more. Remember, these two gentlemen are on motorcycles. It's not a situation where Mr. Cox is in a car, able to hide whatever instruments of death he may have, a gun, a knife, whatever. They're on their motorcycles. He had it in his pocket. Right. But he's driving a motorcycle. He's working the clutch. He's working the throttle. Hands are there. The officer could clearly see if he were to make any furtive movements. Now, remember, the officer said this wasn't a felony flight situation. Well, the officer is within a few feet of him. And if he's jumped the gun, so to speak, and makes the furtive movement, he's got to step ahead of the officer at that point, doesn't he? Well, certainly he has to step ahead of the officer if the officer hadn't said, I had my hand on my weapon. That's fine. There's no problem with that. That's different than pointing a loaded weapon, as the officer said, trained on him. The officer had his hand on his weapon. Mr. Cox, on the officer's own testimony, still had his hands on the handlebars. Officer says he steps off, trained his weapon on Mr. Cox, told him keep your hands on there. He complied. No furtive movements. Right. And he put his gun back, all within 10 seconds. Correct. After he approached Mr. Cox within arm's distance with his gun trained on him. Now, had the officer slipped, made a mistake in some movement getting off his gun? We can't take that back. Is summary execution okay in that situation? It did happen. So the question is, in light of all the circumstances, was pulling the gun for less than 10 seconds reasonable? I would say no. Because, again, under the officer's own testimony, everything he knew about the Hells Angels, his experience and training, said that in personal experiences, I've never had a problem with them. I never learned anything specifically about the Hells Angels. And, in fact, he characterized Mr. Cox as cooperative. So nothing in that equation. What did he say about the Hells Angels, then, that caused him to take that into consideration? Well, that was what I brought out in cross-examination. He said, generally, they're known to be dangerous. We know they're a gang and they're dangerous. When cross-examined, he said, nothing specifically learned about the Hells Angels that I learned said that they were dangerous. Officer, you were asked, did you ever have any confrontation? Have you ever pulled over the Hells Angels? Yes, I have, and I've never had a problem. Have you ever heard of any other officer having a problem? No, I never have. So his general knowledge was contradicted by what he testified to, specifically with regard to Mr. Cox as a Hells Angel. Never any problem with Mr. Cox. He characterized him as, quote-unquote, cooperative. You know, what informs us about what's reasonable and what's unreasonable is our general experiences in life. And the general experience is that all law enforcement officers have been to funerals of other law enforcement officers who were shot during traffic stops. As a matter of fact, if you take a look at the San Francisco paper today, you'll see there's a trial going on right now where somebody stopped by a police officer with methamphetamine, didn't want to go to jail, so he shot the police officer. The police officer's dead. And the question here in this case is whether it was reasonable under these circumstances when the motorcycle takes off, obviously trying to get away, comes back for the officer simply to point the gun at him for 10 seconds. This is not a situation where you just stopped somebody on a motorcycle and walked up to him with a gun pointed at his head. It's the behavior of Mr. Cox that triggered the officer's concern in the district court, and factual matter found that these things happened. Well, I would submit to the Court that had he not been wearing a Hell's Angels patch, that there would have been a difference in the way that the officer approached this person, because numerous times, as the officer testified to. But he was wearing a Hell's Angels patch. Right. But is that dispositive of allowing the officer to use the threat of deadly force? It's dispositive, no. But in the totality of the circumstances, which is a test that some justices on the Supreme Court don't like, but the totality here, it adds to the mixture, does it not? I would agree that it adds to the mixture if, if you take it out, those facts certainly tip in the scale. But where do we stop? Do we say that if a black officer is seeing a speeder? We don't have to get into that game, because we decide cases based on facts right here. Correct. But we're saying that it's a fact that Mr. Cox is a member of the Hell's Angels, and this court is asking, should it not be taken into consideration? I don't think in this circumstance it should, because the factors that came before it don't tip in the favor of using the extreme threat of deadly force of a gun pointed at the person. I just don't think. So you're saying if somebody's trying to get away from a police officer, there are no circumstances under which you can ever point a gun at the person and yell stop? No, that's not what I'm saying. I'm saying that there must be something articulable, like a furtive movement or an aggressive gesture. You have to wait until somebody reaches for a gun? Well, no, not necessarily a gun. But Mr. Cox, under the officer's own testimony, made no aggressive gestures or furtive movements that would cause that officer to escalate the situation where there is the risk of death. Because the officer took command before that was allowed to happen. Well, I guess we don't know, because we don't know what would have happened. But nevertheless, we know from the facts of the record that Mr. Cox never removed his hands from those handlebars. Could I ask another question? I understand your position, but you're running out. And we did send you a case. Yes, Your Honor. In your briefs, you assumed that if there was excessive force, there would be a suppression of the drug. That was an assumption you made. Yes, Your Honor. But that's certainly called into question by ARNA, where the court said, but even if we were to conclude excessive force was utilized, we would not suppress the fruits of the document and safety inspection. Why isn't – why shouldn't we follow that case? There's another district court case which is even more specific. Of course, it's the Supreme Court case of Harris, which is important. Why is it even relevant? Why do we even get to it? Because this Court has read the cases, and I won't go over them. You have limited time. Yes, Your Honor. It strikes me that maybe we don't even need to decide the issue, because even if there was excessive force, we would not – the district court should not suppress the fruits of the drug. This Court has consistently done that in Fourth Amendment violations. Has consistently done what? Suppressed fruits of illegal searches and seizures. United States v. Shepherd, with which this Court is familiar, is a case where there was a Fourth Amendment violation. What's the name of the case that you say is different from Arna and Harris? United States v. Shepherd, 21F3rd 933. It's a Ninth Circuit case where the Fourth Amendment violation was found in an unreasonable arrest, and the Court went through the analysis of whether the exclusionary rule is applicable and set forth three criteria, proximity, no intervening acts, and deterrent effect, in that case. This is a criminal case? Yes, Your Honor. It is a criminal case. Certainly, I would tell the Court that district – a First Circuit court of appeals case, footnote 11, is dicta, and the cases relied upon by ARRA don't even relate to the ARRA case. Painter was a circumstance where there was no standing for a Fourth Amendment violation. They are not good straight cases. It was not an excessive force case. The other case cited was a State case. Certainly. But it's not inconsistent with Harris, where there was an entry into a home and the lead opinion says that the three cases stand for opposition, that the indirect fruits of an illegal search arrest should be suppressed when they bear a sufficient close relationship to the underlying illegality, and then went on to allow the material that was secured in a home, even without a warrant. How would you distinguish Harris? Because in this situation, we have proximity. I'm sorry, Judge. In this situation, we have proximity. The illegality that I'm asserting was the excessive force. If we concede it is excessive force, taking the evidence from the person immediately or contemporaneous with the illegality certainly creates the proximity. The excessive force lasted 10 seconds. He put the pistol back into his holster, and then he was able to secure. The excessive force had nothing to do with the stop and the search. It had to do with whether he used too much force. It seems to me that Harris is right on point. But if we have a Fourth Amendment violation, then we have to go through the analysis laid out in Shepard as to whether the exclusionary rule applies. And that analysis says, was there proximity? And this Court said that there can be no closer proximity than taking the evidence at the moment of the illegal search. That's what we have here. And it was very closely removed. In Shepard, we have the illegal search. Of the search. I'm sorry. When he conducted the search, it was in close proximity to the illegality. But it's not connected. There's no question that it was appropriate for the officer to stop Mr. Cox on the motorcycle. No question about that at all. And no problem with asking him if he had a gun. And he said yes. And so once he said, I've got a gun, there's no problem with taking it away from him. And once he takes it away from him, there's probable cause to arrest him for carrying a concealed weapon, to search him incident to the arrest, and the methamphetamine shows up. So it seems that the excessive force exists in its own plane and is utterly irrelevant to what is served by allowing this to be kicked out. The seizure was okay. Asking for the gun is okay. Pacton is okay. Finding the gun is all right. Finding the methamphetamine is all right. I don't think that the excessive force, when you have a Fourth Amendment violation, the means used to effect that arrest was excessive. I don't think that removing the gun, asking if he has a gun, is sufficiently attenuated from that illegality. We don't use a but-for test, but we do. You didn't mean that this was going to happen. No, it wasn't. Because not every stop results in an officer asking a person. I mean, this was going to happen, meaning ask him. Sure it was going to happen. He didn't ask him for a gun because he pointed the gun at him. Routinely in traffic. Asked him if he had a gun because of the circumstances, the flight, the Hells Angels, the location, the fact that there were just two of them. Well, I don't concede that it was flight because the officer's own testimony says it was not flight. But certainly every traffic stop is different. But we know routinely that we're not asked if we're carrying a gun for a traffic stop. Well, he wasn't asked if he was carrying a gun because the officer pointed a gun at him. He was asked if he was carrying a gun because the officer was concerned for his safety. Because he was a member of the Hells Angels. And that's what's critical here. Is that enough to ask for the officer? No. It's the totality of the circumstances. It's the speeding. It's the behavior then. It's the turning around. It's the confrontation face-on and the Hells Angels thing. Well, again, I go back to my point that had he not been wearing a Hells Angels patch, this circumstance would not have occurred, and the officer conceded that. So then we go back to that same point. Is that patch membership enough to allow the officer? Any officer now under this ruling can point a gun at a Hells Angels member if he fails to stop when the officer subjectively believes that he should have done it sooner. You know, if you want to run around advertising that you're an outlaw, then you're going to have to pay the price of that. It's like the Nazis in Toledo. People take into consideration all the time participation in groups. If you're the Nazis and you want to march, society allows the police to do one thing. If you're the mothers against drunk driving, it's a whole different deal. You take your chances when you declare your hand. Well, I suppose that that has two problems. Number one, it infringes upon his First Amendment right to be associated. I argued that case in the Supreme Court in the Abel case, the last case I argued. We got a 9-0 decision out of the Supreme Court saying it's perfectly appropriate to bring up association on cross-examination when it's relevant, and the court here decided this was relevant. But the other thing your question assumes is that every member of the Hells Angels is an outlaw. Every member of the Hells Angels is an outlaw. That's why you're dealing with things like probable cause and reasonable suspicion. You don't have to have conclusive proof. Certainly, but in order to paint a broad brush on every member such that they are now allowed to use the threat of Every member of the Nazi party is not an evil person either, but you don't know that until you have the circumstance under control. But does that get to the point where we're allowed to then say to the officer, go ahead and point your gun at them because they are a member of a certain organization? And I think that's what the trial court's ruling essentially does. It says to the police that if you have that one extra factor, you don't need anything else. Go ahead and use the threat of deadly force, and I think that's a very dangerous. Your idea was the officer should have waited until he made a furtive move. Yes, and I don't know exactly what that furtive movement is other than if he removed his hands from the handlebars. On a motorcycle, if you're stretched out here, it's a long distance to grab your gun when the officer already has his hand on. So, yes, when we use the threat of deadly force, that is a final thing. I think there must be something more than just not pulling over when the officer felt he should have. If there are no further questions, your time is up. Would you please give the citation of Shepard to the clerk so that we can have it? Thank you, Your Honor. All right. Ms. Boone. If you may please, Your Honor. Linda Boone on behalf of the United States. This is a case of common sense, Your Honors. The defendant failed to comply with the universal symbols of siren and flashing lights to pull over and stop for a law enforcement officer, and that is what brought us to this situation today. If the defendant had simply followed the rules. Well, your opposing counsel suggests that that's not quite right, that it went down simply because he had the Hell's Angels patch. And that is not correct, Your Honor. The record is clear that the officer testified that it was not just the fact that he was wearing the Hell's Angels vest, but the fact of his evasive tactics. The officer testified that even if this defendant were not wearing a Hell's Angels vest but had committed the evasive tactics, that he believes he would have pulled his gun just the same. Remember that this defendant was driving at approximately 65 miles per hour, 64 miles per hour through a school zone. He made a rapid advance, four blocks, quick right turn, quick left turn, and as the motorcycle officer testified, he got up to 80 miles per hour and barely saw the defendant making these turns. The defendant does not challenge any of the factual findings of the district court. We are, therefore, talking about a challenge to 10 seconds of a threat of deadly force. That 10 seconds or less, that was just an estimate by the officer, amounted to just the time it took for the officer to determine whether or not the defendant in this case was going to be compliant. He had every reason to doubt that the defendant would be compliant, because he had already failed to comply with the siren and the red and blue flashing lights to pull over and stop. It was not until they were on a head-on collision path that the defendant in fact stopped. This officer, therefore, was left alone with what alternative. He didn't know if he was going to face a physical altercation, a weapon, or a fight. He could have been run over with the motorcycle when they both stopped. He didn't know what he was going to face. The district court did conduct the proper analysis in this case under the Supreme Court cases. He specifically considered all of the circumstances. He specifically considered and emphasized that the officer faced a possible threat of violence, a danger to his safety. He didn't know what the offense might be, but we were certainly past the stop of a – past the point of a simple stop for speeding. And as it turned out, his intuition was correct because the defendant turned out to have a weapon and drugs on his person. But as the Court has noted, once it appeared that the defendant was going to be compliant, the officer reholstered his weapon and he had not even placed the defendant in handcuffs at that point. He simply observed that the defendant was compliant at that point. I think – Well, let me ask you, what's your position on the Arner case? Your Honor, I believe that this was absolutely a reasonable act on the part of the officer. But as the First Circuit Court has pointed out, there are alternatives because society has an important interest in putting away criminals, having a trial, avoiding other crimes, and there are alternatives to suppression of the evidence. Deterrence, obviously, is the purpose of the exclusionary rule. And in a case if excessive force were to be found by this Court, there are other alternatives that could be used, such as a civil action, police hearing, disciplinary action against the police officer, if that was warranted. Counsel came up with Shepard as a distinguishing Arner from this situation. Are you familiar with Shepard? Yes, Your Honor. But I don't believe that counsel has pointed out to this Court that all the facts are necessary. Defense counsel wants this Court to focus only on the fact that the defendant was wearing a Hell's Angels vest. But that was not the overriding factor. The overriding factor was the evasive tactics. The first thing that drew the officer to the defendant. I'm not sure you're going to the point I'm going to. I'm sorry, Your Honor. You're back on your other argument. What I want to press you on is the position of the government as to whether or not excessive force is even relevant to whether or not there should have been suppression. Excessive force. I'm not sure that you can go into the details of the Arner case. It's stated it's not very well. Yes. It's not well stated, Your Honor. Did you do some research to find any other cases? I did not find any other cases, Your Honor, but I don't believe that it's well pointed, especially that it's just the footnote, as defense counsel noted. But the State court, I believe it was Alaska, Sundberg, did have a very good reasoning. It said that we have to take into account the protection of society. Excessive force, even if we find it. There are some cases out there. Did you read Harris, U.S. against Harris, the Supreme Court case? I'm sorry, Your Honor, I don't. It's fairly close. I believe that. The case also is Guadarrama, which is a district court case in which a very, very well-written case in which district court says, although damages are available in a civil section 1983 action if the officer's conduct falls short of an objectively reasonable standard in citing Graham, evidence is suppressed from a criminal trial only if the officer's conduct was so excessive that it shocks the conscience in citing Roshan. It strikes me as this is an area that the government might have given some assistance to us on as to whether or not in the circumstance of these kinds of cases, as distinguished from the 1983, whether in a criminal case it's should be suppressed at all. The case goes on to point out that an officer's discovery of evidence is rarely causally linked to the degree of force used, making suppression not well designed to control the excessive force. That is, the whole idea behind the suppression is to control process. There's a series of cases here that indicate excessive force cases unless they shock the conscience. We don't even get to whether or not there was reasonableness under the circumstances. It's just a non-issue. It would have been helpful, I think, if the government had taken the time to give us adequate research in this area. I thought we'd tipped you off on this Arna case. Your Honor, I certainly don't think that we had anything close to a circumstance where we have excessive force that shocks the conscience here. That isn't the test that you were giving in your brief, so we kind of needed some assistance here, which we usually hope to get from the lawyers. In this case, Your Honor, the government's position is that you did not have unreasonable force and that since there was no challenge at all to the findings of the district court, that you were only faced with whether or not this 10 seconds was reasonable or not, and we had less than 10 seconds possibly. And even if you did find excessive force, as this Court has unfortunately had to point out to the government, there shouldn't be suppression in this case because there are alternative actions that could be taken for deterrence of an officer's use of excessive force. If the Court has no further questions, I thank you for the argument. The matter just argued will be submitted.
judges: Wallace, Trott, Rymer